**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

| | |
|---|---|
| **LUIS MARTINEZ,** <br> **SHARAI MARTINEZ,** <br> **VALERIA MARTINEZ,** <br> **LUIS MARTINEZ JR.,** <br> **THE LALO GROUP, INC.,** <br> **LALO HOLDINGS LLC,** <br> **LALO DRYWALL INC.** | Case No. |

**PLAINTIFFS**

v.                                                                                               **COMPLAINT**

**UNITED STATES OF AMERICA;**
                                                    **DEFENDANT.**

---

**INTRODUCTION**

1. This is an action under the Federal Tort Claims Act, ("FTCA"), 28 U.S.C. §§ 2671-2680, for damages resulting from Defendant's unlawful five-month detention of Plaintiff Luis Martinez ("Plaintiff" or "Mr. Martinez"), from January to June 2019. Defendants claimed that they were detaining Plaintiff, who is a Mexican citizen and a successful businessman in New Paltz, New York, in order to reinstate a prior removal order and deport Mr. Martinez to Mexico. However, despite repeated demands, Defendants did not issue a valid notice of reinstatement until May 13, 2019, in response to a petition for a Writ of Habeas Corpus which Mr. Martinez filed in US District Court seeking his release. On June 14, 2019, the District Court granted Mr. Martinez's petition and ordered his release, finding that the belated service of the notice of reinstatement did not render his previously-unlawful detention lawful.

2. As a result of this five-month long unlawful detention, Mr. Martinez, and three companies he owns, Plaintiffs Lalo Group, Lalo Holding, and Lalo Drywall ("the Lalo companies") lost and continue to lose millions of dollars in contracts and investments and related damages.   In addition, he and his three children (Plaintiffs Saria, Valeria and Luis Martinez Jr.) suffered significant emotional distress as a result of Mr. Martinez's detention and their separation.

3. Plaintiffs therefore now bring this action pursuant to the Federal Tort Claims Act for damages resulting from this five-month long unlawful detention.

**JURISDICTION**

This action arises under the Federal Tort Claims Act, 28 U.S.C. §§ 2671- 2680.   The Court has jurisdiction under 28 U.S.C. §§ 1331 and 1346(b).

**VENUE**

4. Venue lies in this Court pursuant to 28 U.S.C. 1391(e) because a substantial part of the events giving rise to the claim occurred in this district and Plaintiff Luis Martinez was detained in this district.

**PARTIES**

5. Plaintiff Luis Martinez is a citizen of Mexico, who has resided continually in the United States since 1990.   He was detained by the New York Field Office of the US Immigration and Customs Enforcement (ICE), a sub-agency within the US Department of Homeland Security, from January 16, 2019, until released by order of this Court on June 17, 2019.

6. Plaintiffs Sharai Martinez, Valeria Martinez and Luis Martinez Jr. are the minor children

2

of Plaintiff Luis Martinez, who all resided at all material times hereto, and continue to reside, in New Paltz, New York.

7. Plaintiffs The Lalo Group, Inc., Lalo Holdings LLC, Lalo Drywall Inc. are three corporations duly organized pursuant to the laws of the State of New York, whose principal place of business is and was at all material times hereto located in New Platz New York, and which are all principally owned and managed by Plaintiff Luis Martinez.

**EXHAUSTION OF REMEDIES**

8. Plaintiffs have fully exhausted their administrative remedies.   On January 14, 2021, they submitted administrative claims to DHS, which were denied on July 16, 2021.

**FACTS AND CLAIM**

9. Plaintiff Luis Martinez was born in Durango, Mexico in 1978.   In 1983, his father was killed in a shooting, and his mother, Maria Luisa Raymundo Gallegos, came to the US. In 1990, when he was twelve or thirteen, Mr. Martinez came to the US with his siblings to live with their mother, first in Florida and then in New Paltz, New York.

10. In 1997, when he was nineteen years old, Mr. Martinez returned to Mexico briefly and upon his attempted return to the US, on or about August 27, 1997, he was found inadmissible and was issued an order of expedited removal pursuant to 8 U.S.C. § 1225(b)(1), and deported back to Mexico.

11. While he was in Mexico, Mr. Martinez was abducted by two men, who were nephews of the man who had killed his father back when Mr. Martinez was a child.   Apparently concerned that he intended to avenge his father's killing, these two men warned Mr. Martinez at gunpoint that he should leave Mexico and return to the US unless he wanted

to end up killed.

12. As a result, Mr. Martinez then returned to the US, and resumed living in New Paltz with his family.

13. On May 9, 1999, Mr. Martinez's brother, Jesus Jose Martinez, was shot to death right in front of him. No motive was ever established and no-one was ever arrested, and the investigation remains open.

14. In May 2001, Mr. Martinez became eligible to file an application with USCIS for a green card (a process known as "adjustment of status") based on an immigrant visa petition which his mother had previously filed for him. On November 25, 2003, that application was denied on the basis that the 1997 expedited removal order made him inadmissible to the US. That expedited removal order was then "reinstated" pursuant to 8 U.S.C. § 1241(a)(5), and on December 2, 2003, Mr. Martinez was again deported to Mexico. "But for" that 1997 return trip to Mexico, and subsequent order of expedited removal, Mr. Martinez's application for adjustment of status would have been granted.

15. Mr. Martinez again returned to the US after that deportation, and returned to New Paltz, where he began to develop his business as a contractor and developer. Mr. Martinez also married his long-time girlfriend, Ernestina Martinez, and they had three children: Plaintiffs Sharai Martinez, Valeria Martinez, and Luis Martinez Jr.

16. Between 1996 and 2017, Mr. Martinez was charged and convicted in New York state courts of a number of minor criminal offenses, all of which resulted in conditional discharges and no jail time.

17. In 2016, Mr. Martinez learned that a 2007 amendment to the immigration law allowed him

to apply for a "U" visa based on the 1999 murder of his brother, Jesus Jose.

18. In 2000, Congress had created the "U" visa category for immigrant victims of crime who cooperate with law enforcement in the investigation or prosecution of a crime. U visa regulations promulgated in 2007 recognized that certain indirect victims could also qualify for a U visa status, where the direct victim was killed by murder or manslaughter. Applications for U visas are filed with USCIS, who make the final administrative determination on the application.

19. There is a statutory cap on the number of U visas that can be issued every year. In the past several years, U visa applications and approvals have far exceeded this statutory cap, and as a result there is a backlog of U visa applications awaiting adjudication and visa issuance.

20. To address this backlog, USCIS enacted a regulatory "waiting list," whereby it conducts an initial adjudication to determine whether or not the application is prima facie eligible for a U visa, and places "eligible petitioners who, due solely to the cap, are not granted U-1 nonimmigrant status . . . on a waiting list." 8 C.F.R. § 214.14(d)(2). While on this "waiting list", USCIS will grant the applicant deferred action (a form of relief from removal) and may grant work authorization.

21. Being subject to removal and/or being subject to a deportation order does not make a person ineligible for a U visa. In order to ensure that a U visa applicant with a deportation order is not deported while their application is pending, Congress authorized DHS to grant U visa applicants with outstanding deportation orders "an administrative stay of a final order of removal" until final administrative adjudication of the U visa by

DHS once the U visa application is determined to be prima facie approvable.  8 U.S.C.§ 1227(d)(1).

22. The procedure for making a "prima facie" determination and granting a stay of removal is set out in a 2009 ICE memorandum, which states that when an individual with a pending U visa application applies for a stay of removal, ICE requests a prima facie determination from USCIS, if one has not already been made.  If USCIS finds that the applicant is prima facie eligible for a U visa, ICE "should favorably view an alien's request for a Stay of Removal….  When deciding the stay request, [ICE] should also consider favorably any humanitarian factors related to the alien or the alien's close relatives who rely on the alien for support".

23. In September 2016, Mr. Martinez filed an application for a U visa with USCIS, based upon a certification from New Paltz Police Department that he had been helpful or useful in their investigation into the 1999 murder of his brother, and that application remained (and remains) pending.

24. On January 16, 2019, ICE officers arrested Mr. Martinez outside his place of business on Front Street in New Paltz, New York, and took him to the Orange County Correctional Center in Goshen, New York.  Mr. Martinez was informed that he was being detained in order to "reinstate" the 1997 deportation order, and then deport him to Mexico.

25. If a person who has been deported is found to have re-entered the US illegally, the removal order is "reinstated", and he is not eligible for any relief from removal, 8 USC § 1231(a)(5), subject to two significant exceptions: withholding of removal and deferral of removal under the Torture Convention, and U status.

26. The regulations at 8 C.F.R. § 241.8(a) and (b) set forth the specific steps and procedures to be followed by ICE in reinstating a removal order. First, the removal order to be reinstated must be obtained, the identity of the person who is the subject of the order must be verified, and he or she must be afforded an opportunity to make a statement regarding whether or not he entered the US illegally, or to otherwise contest the reinstatement, and must be provided with a written notice of the reinstatement. A copy of the reinstatement order and determination must also be served on the person's attorney, if represented, 8 C.F.R. § 292.5(a).

27. The reinstating officer must also inquire as to whether or not the person has a fear of returning to their home country, 8 C.F.R. §§ 208.31, 241.8(e), and if so, they must be immediately referred to an asylum officer for a "reasonable fear" interview, 8 C.F.R. § 241.8(e). If the asylum officer finds that the person has a reasonable fear of harm, then he or she is referred to an Immigration Judge for a hearing on a claim for what is known as withholding of removal or deferral of removal under the Convention Against Torture, two forms of legal status which allow the person to remain living legally in the United States, subject to certain terms and conditions. If the asylum officer does not find that the person has a reasonable fear of harm, the person can seek review of that determination before an Immigration Judge. Thus, even people with reinstated removal orders remain eligible for withholding of removal or deferral of removal under the Torture Convention.

28. Although the ICE officers informed him that he was being detained for reinstatement of the 1997 removal order and then for deportation to Mexico, Mr. Martinez was not served with any such order. Mr. Martinez's immigration attorney contacted the ICE officers and

7

asked for a copy of the reinstatement order, but none was provided, either to her or to Mr. Martinez. As a result, Mr. Martinez's arrest and detention lacked any lawful basis.

29. On January 25, 2019, Mr. Martinez's immigration attorney filed a request for an administrative stay of removal with ICE, on the basis that he had a pending U visa application.   Although regulations required ICE to immediately request (and USCIS to issue) a "prima facie" determination for the U visa application upon receipt of the request for a stay of deportation, no such determination was issued and instead, on March 22, 2019, Plaintiff was informed that his deportation to Mexico was "imminent".

30. Even though the stated basis for Plaintiff's detention and imminent deportation was the reinstated order of removal, neither Plaintiff nor his attorney had received or been served with such a reinstated order.

31. On March 24, 2019, Plaintiff filed a petition for a writ of habeas corpus in this Court, *Martinez v. Nielsen et al*, Case No. 7:19-cv-02627-NSR, seeking a stay of removal and an immediate release from custody.

32. On March 26, 2019, ICE denied Mr. Martinez's request for a stay of deportation, on the basis that "there is no compelling reason to warrant a favorable exercise of discretion in his case".   However, a U visa applicant is not required to show "compelling reasons" to justify a stay of removal. Instead, a stay of removal should be granted unless there are "compelling reasons" to deny it, such as national security concerns or "significant" criminal or public safety concerns.

33. Once the stay was denied, on March 26, Plaintiff was again informed that his removal to Mexico was imminent, even though neither he nor his attorney had been served with the

8

reinstatement order which was the basis for his detention and his deportation. Despite this lack of a reinstated order, and faced with the threat of immediate deportation, Plaintiff (though his attorney) requested a "reasonable fear" interview with an asylum officer.

34. The purpose of a "reasonable fear" interview is to determine if a person who is subject to a reinstated order of removal has a "reasonable fear" of persecution or torture. A person who establishes such a fear can then apply to an Immigration Judge for "withholding of removal" and "deferral of removal", two forms of relief from deportation, which, if granted, allow the person to remain living legally in the US, but without the ability to obtain permanent residence or citizenship, or the ability to re-enter the US after travel abroad.

35. Mr. Martinez's attorney again requested a copy of the reinstated order prior to the "reasonable fear" interview, as well as at the interview, but as with the previous requests, none was provided.

36. Mr. Martinez's fear of persecution or torture if returned to Mexico was based on his provision of information about a Mexican drug cartel to US law enforcement authorities in 2014 and 2015, that cartel's subsequent attempts to contact him through 2016, and implied threats when he refused to remain in contact with them.

37. The "reasonable fear" interview was held on March 28, 2019, and by decision dated April 3, 2019, the asylum officer stated that he found Mr. Martinez's testimony credible, yet still denied his claim. Attached to the asylum officer's decision was an incomplete purported notice of reinstatement, dated July 2014, which was not properly signed by an ICE officer or by Mr. Martinez, who had never seen the document before. In fact, Mr. Martinez had

never met with an immigration officer in July 2014. Mr. Martinez immediately sought review by an Immigration Judge of the asylum officer's decision.

38. On April 4, 2019, Mr. Martinez's immigration attorney wrote a letter captioned "Urgent Request for Reinstatement Order" to Sean Hunter, the ICE officer with responsibility for Mr. Martinez's case, requesting "the reinstatement order and any sworn statement taken in conjunction with issuance of the order, any documentation related to Mr. Martinez's expressed fear of return if deported, the prior order underlying the reinstatement order, any evidence regarding his manner of entry to the United States, and any fingerprint analysis verifying Mr. Martinez's identity."

39. ICE did not respond to this letter.

40. On April 21, 2021, Mr. Martinez filed a First Amended Petition for a Writ of Habeas Corpus ("the Habeas action"), seeking his immediate release from ICE custody and an order enjoining ICE from deporting him to Mexico, based on the lack of a reinstated removal order as well as the incorrect standard applied to his U visa application.

41. On April 23, 2019, Immigration Judge Charles Conroy reversed the decision of the asylum officer and found that Mr. Martinez had a credible fear of persecution and torture if deported to Mexico and scheduled another hearing on his claim for June 10, 2019 (which was rescheduled and then the case was "administratively closed", meaning that it remains pending but without any future hearing date). Judge Conroy also expressed serious reservations about the lack of a reinstated removal order, which is a predicate for a reasonable fear claim, but found that he lacked jurisdiction over the issue.

42. On May 7, 2019, Immigration Judge Conroy held a so-called "bond hearing", at which

    Mr. Martinez only appeared by video link and was unable to testify.    Instead, the hearing was based solely on a review of certain documents, including Mr. Martinez's criminal history, and denied Mr. Martinez's request to be released from custody, in large part because of a 2014 DUI.

43. On May 13, 2019, Mr. Martinez filed an Order to Show Cause with the District Court, seeking his immediate release from ICE custody.

44. In response to this Order to Show Cause, ICE served Mr. Martinez with a reinstatement notice ("the May 2019 reinstatement notice"), which purported to reinstate the 1997 order of expedited removal.    It was dated May 13, 2019, alleged that Mr. Martinez had been removed from the US on August 28, 1997 and had illegally reentered the US on an unknown date at an unknown place, and at the bottom of the page contained a section entitled "Decision, Order and Officer's Certification", which stated that "Having reviewed all available evidence, the administrative file and any statements made or submitted in rebuttal, I have determined that the above-named alien is subject to removal through reinstatement of the prior order, in accordance with section 241 (a)(5) of the Act.".    It was dated "May 13, 2019, New York NY" and had a signature of ICE SDDO (Supervisory Detention and Deportation Officer) Waveney Boyd.    Mr. Martinez was not given an opportunity to submit any statement contesting the underlying 1997 order of removal.

45. On May 21, 2019, the District Court signed the Order to Show Cause, directing ICE and the other named defendants in that action to show cause as to why Mr. Martinez should not be released from custody, and restraining them from removing him from the Court's

jurisdiction during the pendency of the action.

46. In response to the Order to Show Cause, ICE submitted a number of documents, including a declaration from ICE officer Timothy Nevins, which stated, "based on my review of Martinez's administrative file, consultation with my colleagues, and ICE electronic records and databases" that "on January 16, 2019, ICE had prepared a reinstatement notice and served it on Mr. Martinez" ("the January 2019 reinstatement notice").

47. A copy of that January 2019 reinstatement notice was submitted to the District Court along with the Nevins declaration.   Although it bore a January 16, 2019 date at the top, and alleged that Mr. Martinez had been deported on August 28, 1997, it did not allege that he had illegally re-entered the US (which is a requirement for reinstatement of a removal order), and the "Decision, Order, and Officer's Certification" section (which is the actual reinstatement order) was dated "August 27, 1997 Brownsville TX" (prior to Mr. Martinez's deportation, on August 28, 1997) and was purportedly signed by Officer Nevins. Nonetheless, Officer Nevins's declaration implied that he had no first-hand knowledge of this January 2019 reinstatement notice.

48. A hearing was held before the District Court on the Order to Show Cause on May 28, 2019, after which supplemental briefing occurred, and a decision was issued on June 14, 2019 (*Martinez v. Nielsen et al*, Case No. 7:19-cv-02627-NSR, ECF 38).

49. In its decision, the District Court found that ICE had not served Mr. Martinez with any reinstatement notice "let alone a facially insufficient one, when it detained him" (Decision, p. 14).   With regard to the January 2019 reinstatement notice, the Court held that "There is virtually no proof that this document existed and was served when the Government

12

purports that it did, and considerable evidence suggesting just the opposite." (id. p. 17). With regard to the May 2019 reinstatement notice, the District Court deemed it as "having no legal substance and failing to comply with statutory and constitutional safeguards." (id., p. 31). The District Court found that "Petitioner's arrest and detention were blatantly unlawful from the start" (id., p. 36) and ordered that Plaintiff be released within five days, and in fact he was released on June 17, 2019.

50. On August 16, 2019, Defendants in the habeas action filed an appeal with the US Court of Appeals for the Second Circuit, Docket No. 19-2533, and on November 27, 2019, the appeal was withdrawn with prejudice.

**Count 1:    False imprisonment**

51. The allegations contained in Paragraphs 1 through 53 above are repeated and re alleged as though fully set forth herein.

52. The ICE officers who were responsible for Mr. Martinez's arrest and detention complained of above were acting in the course of their employment as federal law enforcement or investigative officers.

53. The ICE officers claimed that they were arresting and detaining Mr. Martinez in order to reinstate a prior order of removal and effect his deportation to Mexico. However, no reinstated order of removal was issued until May 13, 2019, almost four months after Mr. Martinez's arrest, and even that reinstated order was deemed to have no legal substance or effect.

54. Accordingly, the entire time of Mr. Martinez's detention, from January 16 until June 17,

2019, was without lawful justification.

55. As a result of this false imprisonment and loss of liberty, Mr. Martinez was damaged in an amount of one million dollars.

56. Prior to his detention by the ICE officers in January 2019, Mr. Martinez, and the Lalo companies had entered into several contracts to perform subcontracting work on a number of construction projects.   As a result of Mr. Martinez's unlawful detention, he was unable to manage and oversee various contracts into which he and the Lalo companies had entered, and also unable to comply with their contractual obligations.   This resulted in their termination, and in some cases, in liability to Mr. Martinez and the Lalo companies.

57. As a result of Mr. Martinez's unlawful detention, and his inability to manage and oversee the various contracts into which he and the Lalo companies had entered, he and the Lalo companies became liable on insurance bonds which they had guaranteed or agreed to indemnify to various insurance companies, including but not limited to Great Midwest Insurance Company.   This caused them actual pecuniary damages, and also limited their ability to obtain insurance coverage subsequently, which in turn led to loss of other business opportunities, and/or higher insurance premiums.

58. Mr. Martinez's unlawful detention also caused him and his companies to be unable to comply with his own financial and other commitments to various projects, thus causing him to forfeit investments he had made in commercial endeavors, including but not limited to an investment in Net-Zero Development LLC.

59. Mr. Martinez's unlawful detention also caused damage to his reputation and to the reputation of the Lalo companies.

60. As a result of these economic losses caused by his unlawful imprisonment, Plaintiff Luis Martinez as well as Plaintiffs the Lalo companies suffered and continue to suffer damages in an amount of five million dollars each.

61. Also as a direct result of his unlawful imprisonment, Mr. Martinez suffered severe emotional distress, was separated from his wife and family for five months, and was worried about their emotional as well as their economic and physical wellbeing, which caused him further emotional distress, in an amount of two million dollars.

**Count 2:       Infliction of emotional distress: Plaintiff Luis Martinez**

62. The allegations contained in Paragraphs 1 through 61 above are repeated and re alleged as though fully set forth herein.

63. The ICE officers who were responsible for Mr. Martinez's arrest and detention owed him a duty of care, to either serve him with a notice of reinstatement of the prior order of removal when he was arrested, or within a reasonably soon time thereafter, or else to release him.   The ICE officers did not do so, and instead kept him detained, without any lawful process or authority, for a full four months before serving him, belatedly, with a notice of reinstatement on May 13, 2019.

64. As a direct result of this unlawful imprisonment, Mr. Martinez was fearful of being deported, as the ICE officers repeatedly told him that his deportation was imminent.   He was also fearful of being subjected to harm in Mexico if he was deported, and in fact an Immigration Judge later found that that fear was reasonable and well-founded.   In addition, Mr. Martinez witnessed frequent fights between detainees at the facility where he was detained, and he feared becoming a target or a victim in such a fight while

15

detained.

65. During his detention, Mr. Martinez was also separated from his wife and family, and feared greatly for their emotional as well as their economic and physical wellbeing in his absence. Mr. Martinez was also severely distressed at the financial losses that his businesses were incurring as a result of his detention.

66. As a result of this emotional distress, Mr. Martinez suffered physical problems while he was detained, including chest pain, difficulty breathing, shaking, and severe weight loss.

67. As a consequence of the above, Mr. Martinez has suffered loss in the amount of two million dollars.

**Count Three.   Infliction of emotional distress: Plaintiffs Sharai, Valeria and Luis Martinez Jr.**

68. The allegations contained in Paragraphs 1 through 67 above are repeated and re-alleged as though fully set forth herein.

69. The ICE officers who were responsible for Mr. Martinez's arrest and detention also owed a duty of care to his children with whom he lived, Plaintiffs Sharai, Valeria and Luis Martinez Jr., not to unlawfully detain their father.

70. It was a direct and foreseeable consequence of Mr. Martinez's unlawful detention that his children would unnecessarily suffer, and in fact did suffer, emotional distress, including but not limited to sadness and depression, anxiety, separation anxiety, hypervigilance, fear of police and law enforcement officers, shame and embarrassment.

71. As a consequence of the above, Plaintiffs Sharai, Valeria and Luis Martinez Jr. have suffered damages in the amount of five hundred thousand dollars each.

**REQUEST FOR RELIEF**

WHEREFORE, Plaintiffs requests that this Court

1. Grant compensatory damages in the amounts requested above;

2. Grant reasonable attorneys' fees and costs; and

5. Grant such further relief as this Court deems reasonable and appropriate


Dated: New York, New
       January 12, 2022

*Paul O'Dwyer*
Paul O'Dwyer
Law Office of Paul O'Dwyer, P.C.
11 Broadway, Suite 715
New York NY 10004
(646) 230-7444
paul.odwyer@paulodwyerlaw.com